**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

Plaintiff,

v.

QUALITY COLLISION PARTS, INC.,

Defendant.

QUALITY COLLISION PARTS, INC.,

Counterclaim-Plaintiff,

v.

GENERAL MOTORS COMPANY, INC, GENERAL MOTORS LLC, and GM GLOBAL TECHNOLOGY OPERATIONS LLC,

Counterclaim-Defendants.

**Case No.: 2:23-cv-13026-JJCG**

**Honorable Denise Page Hood**

**GM'S ANSWER TO QUALITY COLLISION'S COUNTERCLAIMS**

Counterclaim Defendants General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC, (collectively "GM") by and through their undersigned attorneys, answer Quality Collision Parts, Inc.'s ("Quality Collison") Counterclaims of as follows:

## RESPONSES TO COUNTERCLAIMS

1. On information and belief, GM Global Technology Operations, LLC is a wholly-owned subsidiary of General Motors Holdings LLC, which is a wholly-owned subsidiary of General Motors Company, Inc. General Motors, LLC is also a wholly-owned subsidiary of General Motors Holdings LLC and is the U.S. operating unit of General Motors Company, Inc. These three companies operate in conjunction with each other and coordinated the actions as more fully described herein. Collectively, General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC are described herein as "GM".

**ANSWER:** GM admits that GM Global Technology Operations, LLC is a wholly-owned subsidiary of General Motors Holdings LLC, which is a wholly-owned subsidiary of General Motors Company, Inc. and that General Motors, LLC is also a wholly-owned subsidiary of General Motors Holdings LLC and is the U.S. operating unit of General Motors Company, Inc. GM denies the remaining allegations of Paragraph 1.

2. This Court has personal jurisdiction because each of General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC has a corporate office located in this District at 300 Renaissance Center, Detroit, MI, 48265 and the acts giving rise to Quality Collision's counterclaims took place in this District.

**ANSWER:** GM admits that each of General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC has a corporate office located in this District at 300 Renaissance Center, Detroit, MI, 48265. GM denies the remaining allegations of Paragraph 2.

3. Venue is proper under 28 U.S.C. § 1391(b) because each of General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC has a corporate office is located in this District at 300 Renaissance Center, Detroit, MI, 48265 and a substantial part of the events giving rise to Quality Collision's counterclaims took place in this District.

**ANSWER:** GM admits that each of General Motors Company, Inc., General Motors, LLC, and GM Global Technology Operations, LLC has a corporate office located in this District at 300 Renaissance Center, Detroit, MI, 48265. GM denies the remaining allegations of Paragraph 3.

4. This Court has subject matter jurisdiction over Quality Collision's Counterclaim against pursuant to 28 U.S.C. § 1367 because the Court has original

jurisdiction over Plaintiff GM Global Technology Operation, LLC's claims under 28 U.S.C. § 1331 and Quality Collision's counterclaims are so related to these claims that they form the same case or controversy.

**ANSWER:** Denied.

## FACTS COMMON TO ALL COUNTS

5. Quality Collision and GM are competitors in the automotive collision repair industry.

**ANSWER:** GM admits that, to the extent that Quality Collision sells OEM replacement products for GM vehicles that GM also sells, Quality Collision may be in competition with GM. GM is without sufficient information to admit or deny the remaining allegations of Paragraph 5, and therefore denies.

6. GM sells its own Original Equipment Manufacturer (OEM) replacement parts for GM automobiles.

**ANSWER:** Admitted.

7. Quality Collision sells aftermarket products that are designed to replace damaged or worn original parts to return an automobile to its original condition.

**ANSWER:** GM admits that Quality Collision sells aftermarket collision repair products but is without sufficient information to admit or deny the remaining allegations of Paragraph 7, and therefore denies.

8. The aftermarket industry permits automobile owners to affordably replace damaged or worn automotive parts through competition between the original parts makers – the OEMs – and third-party aftermarket sellers.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

9. OEMs like GM would prefer to avoid competition with aftermarket companies like Quality Collision for the replacement of damaged or worn automotive parts.

**ANSWER:** Denied.

10. To stifle aftermarket competition, GM takes aggressive, and sometimes unlawful action against aftermarket companies.

**ANSWER:** Denied.

11. For example, and without limitation, on information and belief, GM improperly influenced the United States Department of Homeland Security to conduct a raid on Quality Collision's warehouses in Warren, Michigan and Richmond, Michigan from July 6, 2022 through July 15, 2022.

**ANSWER:** Denied.

12. GM did this by preparing and submitting false or misleading allegations that Quality Collision was engaged in counterfeiting or trafficking in counterfeit automotive parts.

**ANSWER:** Denied.

13. On information and belief, the allegations submitted by GM were supplied by GM employee Andrea Ankawi with the assistance or at the suggestion of Raphy Raad Yaldo, who is also employed at GM.

**ANSWER:** GM admits that Andrea Ankawi was involved in providing assistance to the Department of Homeland Security in connection with its investigation of Quality Collision. GM denies the remaining allegations of Paragraph 13.

14. Raphy Raad Yaldo is the brother of Ramy Yaldo, an owner of Special Way Auto Parts, Inc., a competitor of Quality Collision in the aftermarket parts industry.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

15. GM had no reason to believe the allegations it supplied to the United Stated Department of Homeland Security because the information came from its own employees with connections to Quality Collision's competitor.

**ANSWER:** Denied.

16. GM's actions resulted in the issuance of a search and seizure order that resulted in a raid on Quality Collision's warehouses in Warren, Michigan, and Richmond, Michigan.

**ANSWER:** Denied.

17. Some days before the raid, the owner of Special Way Auto Parts, Ramy Yaldo, called Quality Collision and stated Quality Collision was about to have a problem. The day of the raid, Special Way Auto Parts doubled its prices.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

18. Special Way Auto Parts, Inc. sells the same aftermarket GM parts that were seized from Quality Collision by the United States Department of Homeland Security.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

19. On information and belief, Ramy Yaldo, an owner of Special Way Auto Parts, Inc., had advance notice that the United States Department of Homeland Security planned to conduct a raid of Quality Collision's warehouses.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

20. The raid involved hundreds of agents, and it was conducted in a manner that was reckless or indifferent to damage to Quality Collision's facility, inventory, and business operations. The photo below shows a safe which was destroyed during the raid:




**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

21. GM also sent its employees and/or agents into Quality Collision's facilities with United States Department of Homeland Security agents throughout the raid to direct the taking of Quality Collision's servers, business records and inventory, which caused disruption to Quality Collision's business, including the shutdown of its facilities for many months.

**ANSWER:** Denied.

22. The raid also caused damage to Quality Collison's inventory, including non-counterfeit, non-infringing automotive parts, rendering it valueless and causing Quality Collision to scrap destroyed non-counterfeit, non-infringing automotive parts. The photos below show some such non-seized parts destroyed during the raid and the damage caused by the raid:






**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

23. The raid unnecessarily and improperly damaged a great deal of inventory worth hundreds of thousands, if not millions, of dollars, including noncounterfeit, non-infringing automotive parts lawfully in the possession of Quality Collision as shown in the photo below picturing damage to non-seized replacement hoods:



**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

24. In comparison, below is how Quality Collision stores its automotive parts in the ordinary course of business:





**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

25. The raid did not result in seizure of any GM counterfeit parts as attested to in several affidavits provided by GM employee Andrea Ankawi.

**ANSWER:** Denied.

26. The raid also gave GM an unfair advantage in its planned case against Quality Collision for design patent infringement because GM caused the seizure of non-counterfeit inventory that it alleges infringes its design patents.

**ANSWER:** Denied.

27. GM would not have been able to otherwise disrupt Quality Collision's business to this extent on account of design patent infringement claims.

**ANSWER:** Denied.

## COUNT I - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

28. Quality Collision repeats and incorporates Paragraphs 1 to 27 as if fully stated herein.

**ANSWER:** GM repeats and incorporates its answers to Paragraphs 1 to 27 as if fully stated herein.

29. Quality Collision had and has business relationships and expectancies with a number of different entities and individual customers based on years of servicing its customers.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

30. For example, and without limitation, Quality Collision has an expectancy of selling aftermarket automotive parts to a number of customers in the business of vehicle repair, including even General Motors dealerships.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

31. Quality Collision sells aftermarket automotive parts in competition with GM.

**ANSWER:** GM admits that, to the extent Quality Collision sells OEM replacement products for GM vehicles that GM also sells, Quality Collision may be in competition with GM. GM is without sufficient information to admit or deny the remaining allegations of Paragraph 31, and therefore denies.

32. GM is aware of Quality Collision's business relationships and expectancies, and GM conspired to cause the United States Department of Homeland Security to use its power to raid Quality Collision's facilities in order to intentionally and improperly interfere with such opportunities, and thereby gain a competitive advantage for itself against Quality Collision.

**ANSWER:** Denied.

33. For example, and without limitation, GM caused interference by preparing and submitting allegations that caused the United States Department of Homeland Security to raid Quality Collision's facilities without legal cause or justification.

**ANSWER:** Denied.

34. The allegations included either false statements or otherwise misleading statements that improperly caused the United States Department of Homeland Security to believe, incorrectly, that Quality Collision was engaged in counterfeiting or trafficking in counterfeit parts when GM had no reason to believe this.

**ANSWER:** Denied.

35. On information and belief, GM encouraged the search and seizure order to gain competitive knowledge and other advantage – including litigation advantage – over Quality Collision.

**ANSWER:** Denied.

36. The raid involved hundreds of agents, and it was conducted in a manner that was reckless or indifferent to damage to Quality Collision's facility, inventory and business operations.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

37. GM also sent its people into Quality Collision's facilities with United States Department of Homeland Security agents throughout the raid to direct the taking of Quality Collision's servers, business records and inventory, which caused disruption to Quality Collision's business including the shutdown of its facilities for many months.

**ANSWER:** Denied.

38. The raid also caused damage to inventory, including automotive parts, rendering it valueless.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

39. The raid unnecessarily and improperly damaged a great deal of inventory worth hundreds of thousands, if not millions, of dollars, including noncounterfeit automotive parts lawfully in the possession of Quality Collision.

**ANSWER:** GM is without sufficient information to admit or deny, and therefore denies.

40. The raid also gave GM an unfair advantage in its planned case against Quality Collision for design patent infringement because GM caused the seizure of inventory that it alleges is infringing its design patents.

**ANSWER:** Denied.

41. GM would not have been able to otherwise disrupt Quality Collision's business to this extent on account of design patent infringement claims.

**ANSWER:** Denied.

42. GM's improper and intentional interference has induced disruptions to Quality Collision's business relationships or expectancies, causing damage to Quality Collision.

**ANSWER:** Denied.

43. The raid did not result in seizure of any counterfeit parts as attested to in several affidavits provided by GM employee Andrea Ankawi.

**ANSWER:** Denied.

44. GM did not even have reason to believe that there were counterfeit parts in Quality Collision's facilities.

**ANSWER:** Denied.

45. GM's baseless claims and allegations against Quality Collision were brought in bad faith to conceal an attempt to directly interfere with Quality Collision's business relationships and expectancies.

**ANSWER:** Denied.

**COUNT II – WRONGFUL SEIZURE UNDER 18 U.S.C. § 2320**

The Court dismissed Count II of Quality Collision's Counterclaims, ECF No. 32, and therefore no answers are required to Paragraphs 46-55.

**COUNT III – ABUSE OF PROCESS**

56. Quality Collision repeats and incorporates Paragraphs 1 to 27 as if fully stated herein.

**ANSWER:** GM repeats and incorporates its answers to Paragraphs 1 to 55 as if fully stated herein.

57. When GM conspired with the United States Department of Homeland Security to improperly obtain a seizure order for counterfeit products GM knew did not exist, GM was acting in bad faith and with an ulterior purpose of surreptitiously seeking information and a de facto injunction for its contemplated complaint for design patent infringement.

**ANSWER:** Denied.

58. In addition, GM engaged in improper actions unrelated to the seizure order for counterfeit products, including, but not limited to:

a. GM's seizure of automotive parts that were not counterfeit that GM alleges infringe certain design patents;

b. GM's investigation of Quality Collision's business records and inventory to conduct a pre-suit investigation of Quality Collision for trademark and design patent infringement; and

c. GM's destruction of Quality Collision's inventory and business equipment.

**ANSWER:** Denied.

59. GM's actions constitute bad faith.

**ANSWER:** Denied.

60. Quality Collision was damaged by GM's abuse of process.

**ANSWER:** Denied.

## CLAIM FOR RELIEF

To the extent that any response is required, GM denies that Quality Collision is entitled to any relief, judgment, or order with respect to GM whatsoever.

## AFFIRMATIVE DEFENSES

Without admitting or acknowledging that it bears the burden of proof as to any of the defenses set forth herein, GM alleges the following as affirmative defenses to the Counterclaims and the relief sought therein.

## FIRST AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over the Counterclaims. The Counterclaims do not arise under the Constitution, laws, or treaties of the United States and therefore there is no jurisdiction under 28 U.S.C. § 1331. Additionally, Quality Collision's Counterclaims are not so related to GM Global Technology Operations, LLC's claims of patent infringement such that they form the same case or controversy and therefore supplemental jurisdiction under 28 U.S.C. § 1367 does not exist.

## SECOND AFFIRMATIVE DEFENSE

Quality Collision's Counterclaims fail to state claims upon which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

GM was justified in law to cooperate with a U.S. Government investigation of Quality Collision's alleged counterfeiting activities. GM further is justified in protecting its intellectual property rights from Quality Collision's infringement.

## FOURTH AFFIRMATIVE DEFENSE

Quality Collision's tortious interference claim is preempted by federal patent law because GM did not enforce its patent rights in bad faith.

## FIFTH AFFIRMATIVE DEFENSE

Quality Collision failed to take reasonable steps to protect itself from damages, if any, and failed to mitigate any such damages.

## SIXTH AFFIRMATIVE DEFENSE

Quality Collision's Counterclaims fail, in whole or in part, because the alleged damages incurred or suffered by Quality Collision were not caused by any act or omission or failure of GM. Likewise, Quality Collision's Counterclaims fail, in whole or in part, because the alleged damages incurred or suffered by Quality Collision were not proximately caused by any act or omission or failure of GM. Rather, any alleged damages were the result of Quality Collision's own actions and business practices.

## SEVENTH AFFIRMATIVE DEFENSE

Quality Collision's Counterclaims are barred, in whole or in part, because Quality Collision's damages, if any, were caused by independent, intervening, and/or superseding acts, errors, omissions, and causes which GM had no control and for which GM is not liable.

## RESERVATION OF RIGHTS

GM reserves the right to assert any and all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defense, at law or equity, which may not exist or that may become available through information developed in discovery, at trial, or otherwise.

Dated: October 15, 2024

Respectfully Submitted,

**HONIGMAN LLP**

By: /s/ Dennis J. Abdelnour

Dennis J. Abdelnour
David J. Roulo
155 N. Wacker Drive, Ste. 3100
Chicago, IL 60606-1734
(312) 701-9348
dabdelnour@honigman.com
droulo@honigman.com

J. Michael Huget (P39150)
Scott D. Barnett (P82673)
Latifa H. Dabaja (P84461)
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7000
mhuget@honigman.com
sbarnett@honigman.com
ldabaja@honigman.com

*Attorneys for GM Global Technology Operations, LLC, General Motors, LLC and General Motors Company, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on October 15, 2024.

/s/ Dennis J. Abdelnour

*Attorney for GM Global Technology Operations, LLC, General Motors, LLC and General Motors Company, Inc.*